

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-17-2004

# Kopec v. Tate

Precedential or Non-Precedential: Precedential

Docket No. 02-4188

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Kopec v. Tate" (2004). *2004 Decisions.* Paper 888.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/888

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

No. 02-4188

MICHAEL KOPEC,

Appellant

v.

TYRONE TATE, OFFICER;
TOWNSHIP OF WHITEMARSH

Appeal from the United States District
Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 02-00430)
District Judge: Honorable J. Curtis
Joyner

Argued November 6, 2003

BEFORE: MCKEE, SMITH, and
GREENBERG, Circuit Judges

(Filed: March 17 2004 )

John J. Auritt (argued)
130 East State Street
Media, PA 19063

Attorney for Appellant

Joseph Santarone

Walter F. Kawalec, III (argued)
Marshall, Dennehey, Warner, Coleman
& Goggin
200 Lake Drive East, Suite 300
Cherry Hill, NJ 08002

Attorneys for Appellee Officer
Tyrone Tate

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter comes on before this court on an appeal by plaintiff Michael Kopec ("Kopec") from the district court's order entered on October 22, 2002, granting summary judgment in favor of defendant Officer Tyrone Tate ("Officer Tate") in this action principally brought under 42 U.S.C. § 1983 ("section 1983"). For the reasons stated herein, we hold, contrary to the district court, that Officer Tate is not entitled to qualified immunity on Kopec's excessive force claim and therefore we will reverse the district court's order granting summary judgment in his favor on that basis.

I.  BACKGROUND

In the evening of February 2, 2000, Kopec and his girlfriend, Pamela Smith (whom Kopec later married), trespassed onto the frozen lake at the Sherry Lake Apartment Complex in

Conshohocken (Whitemarsh Township), Montgomery County, Pennsylvania.[1] The lake, which was fenced off, was located on the property where Pamela Smith (now Pamela Kopec) rented an apartment. To gain access to the lake Kopec hopped over the fence and his girlfriend squeezed through an opening in it. The two then proceeded to frolic on the ice.[2] Officer Tate, who then arrived in response to an anonymous call, directed them to get off the lake, and the two complied.

Although Officer Tate did not intend to charge them with trespassing, he did seek to record their names, addresses, and phone numbers for his report and he advised Kopec that he needed this information for that purpose. Kopec nevertheless refused to provide this information, though Officer Tate repeatedly asked for it, and Kopec instructed his girlfriend not to do so either. Officer Tate became annoyed with Kopec and then arrested him for disorderly conduct, and handcuffed him behind his back.

Within about ten seconds of being handcuffed, Kopec began to lose feeling in his right hand and, as a consequence, asked Officer Tate to loosen the handcuffs, but Officer Tate did not do so. Kopec then asked if "this is what he does when people don't give him information." Officer Tate did not answer. A. 30.

Officer Tate took Kopec to his police car several feet away and left him alongside it as he went to interview Pamela Kopec, who was close by. As Officer Tate walked away, Kopec told him the pain was unbearable and begged him to loosen the handcuffs. Again, Officer Tate did not comply with Kopec's request. Kopec began to faint from the pain caused by the handcuffs and then fell to the ground. He asked Officer Tate to remove the handcuffs because he had lost feeling in his right hand. Officer Tate said "I will be there in a minute," and did not go to Kopec immediately. A. 31. Kopec asked him again either to loosen or remove the handcuffs while Kopec was groaning due to excruciating pain. Officer Tate heard Kopec, but took no steps to assist him. According to Kopec, it took Officer Tate about ten minutes from the time he had handcuffed Kopec finally to loosen the

---

[1] On this appeal from an order granting summary judgment against him we are stating the facts from Kopec's perspective. At trial the events may appear in a different light.

[2] Kopec in his brief indicates that he and his girlfriend "were frolicking on the ice" and thus the characterization of their conduct is his. Brief of Appellant at 4.

handcuffs.[3] Kopec claims to have permanent nerve damage in his right wrist as a result of the handcuffing, for which a hand surgeon treated him for over one year.

Kopec concedes that he was trespassing in violation of 18 Pa. Cons. Stat. Ann. § 3503(b)(1)(iii) (West Supp. 2003) and that Officer Tate lawfully was able to arrest and handcuff him. Nevertheless Kopec subsequently brought this action against Officer Tate, alleging that the officer's acts violated section 1983 and were tortious under Pennsylvania law.

On Officer Tate's motion the district court granted summary judgment in his favor on the basis that he had qualified immunity on claims Kopec asserted under section 1983 predicated on the First, Fourth and Fourteenth Amendments and that claims Kopec advanced under the Pennsylvania Tort Claims Act charging intentional, willful misconduct and intentional infliction of emotional distress were barred by the immunity provisions of that act in 42 Pa. Cons. Stat. Ann. §§ 8541 and 8545 (West 1998).[4] Kopec appeals from the district

court's order but only with respect to his Fourth Amendment claim.[5]

---

[3]Officer Tate recalls the period as being between four and eight minutes.

[4]Kopec also sued the Township of Whitemarsh which obtained a summary (continued...)

---

[4](...continued) judgment on an uncontested motion but Kopec has not appealed from this disposition and thus the township is out of the case.

[5]Kopec has waived any challenge to the district court's ruling with regard to his state law claims as in his brief he merely makes passing reference to these claims, stating that "[p]laintiff has also made a state tort claim pertaining to these circumstances" and "Officer Tate's conduct is actionable as a state tort under 42 Pa. C.S.A. § 8542." See Brief of Appellant at 9, 11. Kopec's failure sufficiently to raise this issue waives it on this appeal. See Laborers' Int'l Union v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court.") (citations and internal quotation marks omitted).

Moreover, although he included a First Amendment argument in his brief, Kopec informed us at oral argument that he had abandoned that argument because his action properly was characterized as a Fourth Amendment excessive force claim. Thus, the only remaining issue on (continued...)

3

## II. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 in that the complaint alleged federal civil rights claims under 42 U.S.C. § 1983 and supplemental state law claims. Inasmuch as Kopec's appeal was timely we have jurisdiction pursuant to 28 U.S.C. § 1291.

### B. Standard of Review

We exercise <u>de novo</u> review of the district court's grant of summary judgment. <u>See</u> <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996); <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995). Summary judgment is proper when the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[5](...continued)
appeal is whether the district court properly granted summary judgment on Kopec's Fourth Amendment claim against Officer Tate.

law." Fed. R. Civ. P. 56(c). In reviewing the record, we are required to view the inferences to be drawn from the underlying facts in the light most favorable to Kopec, as the party opposing the motion, and to take his allegations as true when supported by proper proofs whenever these allegations conflict with those of Officer Tate. <u>See</u> <u>Meritcare, Inc. v. St. Paul Mercury Ins. Co.</u>, 166 F.3d 214, 223 (3d Cir. 1999).

## III. DISCUSSION

### A. Qualified Immunity on a Section 1983 Claim

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

4

the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Thus, section 1983 provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws. Estate of Smith v. Marasco, 318 F.3d 497, 505 (3d Cir. 2003); Kneipp, 95 F.3d at 1204.

Qualified immunity is intended to shield government officials performing discretionary functions, including police officers, "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). A defendant has the burden to establish that he is entitled to qualified immunity. See Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

The Supreme Court held in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001), that a ruling on qualified immunity must be undertaken using a two-step inquiry. See id. at 200-01, 121 S.Ct. at 2155-56. First, the court must consider whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. See id. at 201, 121 S.Ct. at 2156; S.G. ex rel. A.G. v. Sayreville Bd. of Educ., 333 F.3d 417, 420 (3d Cir. 2003) (When an individual defendant in a section 1983 action claims he is entitled to qualified immunity, "our first task is to assess whether the plaintiff's allegations are sufficient to establish the violation of a constitutional or statutory right at all.") (quoting Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000)). "If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002).

If, however, "a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." Saucier, 533 U.S. at 201, 121 S.Ct. at 2156. "The relevant dispositive inquiry" in making this determination is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. at 2156. If it would not have been clear to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity.

B. Excessive Force

Our first inquiry on Officer Tate's claim of qualified immunity is whether the facts Kopec asserts, taken in the light most favorable to him, show that Officer Tate violated Kopec's Fourth Amendment rights. "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Estate of Smith, 318 F.3d at 515 (quoting Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999)). Here, Officer Tate does not asssert that Kopec's arrest did not constitute a "seizure." Thus, the only issue on this inquiry is whether the force Officer Tate used to effect that seizure was reasonable.

The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872 (1989). Thus, if a use of force is objectively reasonable, an officer's good faith is irrelevant and any bad faith motivation on his part is immaterial. See Estate of Smith, 318 F.3d at 515; Abraham, 183 F.3d at 289. Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight. See Graham, 490 U.S. at 396, 109 S.Ct. at 1872. A court in making a reasonableness assessment also may consider the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. See Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997). As the Supreme Court has stated,

> [t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

6

Graham, 490 U.S. at 396-97, 109 S.Ct. at 1872. "[R]easonableness under the Fourth Amendment should frequently remain a question for the jury," Abraham, 183 F.3d at 290; however, "'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances,'" id. (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)); see also Estate of Smith, 318 F.3d at 516.

Kopec alleges that Officer Tate placed handcuffs on him that were excessively tight and failed to respond to Kopec's repeated requests for them to be loosened. He estimates that it took Officer Tate ten minutes to loosen the handcuffs despite the severe pain they were causing and his efforts to secure their release. As a result, Kopec claims that he suffered permanent nerve damage to his right wrist. These facts, if credited, would establish that Officer Tate's use of force was excessive in violation of the Fourth Amendment.

In reaching our conclusion that Kopec has asserted facts that if proven would establish that there had been a violation of his constitutional rights, we point out that Officer Tate faced rather benign circumstances that hardly justified his failure to respond more promptly to Kopec's entreaties, at least to

the extent to ascertain if the handcuffs were too tight. Officer Tate was not, after all, in the midst of a dangerous situation involving a serious crime or armed criminals. Accordingly, this opinion should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims. Thus, if Officer Tate had been engaged in apprehending other persons or other imperative matters when Kopec asked him to loosen the handcuffs our result might have been different.

With respect to the second inquiry on qualified immunity, it cannot be said as a matter of law that a reasonable officer would not have known that this conduct was in violation of the Fourth Amendment even though it appears that neither the Supreme Court nor this court has ruled that a police officer may be using constitutionally excessive force in tightening handcuffs.[6]

---

[6] Neither party cites a case from the Supreme Court or this court directly addressing the issue. Indeed, Kopec in his brief indicates that he "has not found a case from the Third Circuit that discusses excessively tight handcuffs at the inception of an arrest or when a police officer purposefully left excessively tight handcuffs on a suspect over time," brief of Appellant at 12, and Officer Tate in his brief states that "at the time of the plaintiff's arrest, it is

(continued...)

7

The Court of Appeals for the Ninth Circuit has noted that at least as early as 1985 the use of excessive force by officers in effecting an arrest was clearly proscribed by the Fourth Amendment as it held, quoting a 1985 Supreme Court opinion, that "the Fourth Amendment governs not only whether a person or thing is subject to a 'seizure,' but also 'the manner in which a . . . seizure is conducted.'" Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993) (quoting Tennessee v. Garner, 471 U.S. 1, 7-8, 105 S.Ct. 1694, 1699 (1985)). Moreover, as we observed in Burns v. County of Cambria, 971 F.2d 1015, 1024 (3d Cir. 1992), "[t]his court has adopted a broad view of what constitutes an established right of which a reasonable person would have known." (citations and quotation marks omitted). Thus, in People of Three Mile Island v. Nuclear Regulatory Comm'rs, 747 F.2d 139, 144-45 (3d Cir. 1984), we held that there does not have to be "precise factual correspondence" between the case at issue and a previous case in order for a right to be "clearly established," and we would not be "faithful to the purposes of immunity by permitting . . . officials one

liability-free violation of a constitutional or statutory requirement." Therefore, we hold that the right of an arrestee to be free from the use of excessive force in the course of his handcuffing clearly was established when Officer Tate acted in this case, and that a reasonable officer would have known that employing excessive force in the course of handcuffing would violate the Fourth Amendment. Accordingly, the district court committed error in granting summary judgment in favor of Officer Tate on the basis of his qualified immunity defense.

In reaching our result we point out that other courts of appeals have made determinations consistent with ours. See, e.g., Martin v. Heideman, 106 F.3d 1308, 1312 (6th Cir. 1997) (reversing grant of directed verdict in favor of arresting officer in a section 1983 action alleging excessive force due to overly-tight handcuffs); Alexander v. County of Los Angeles, 64 F.3d 1315, 1322-23 (9th Cir. 1995) (reversing grant of summary judgment in favor of officers on qualified immunity and holding that fact issue existed as to whether officers used excessive force in refusing to loosen plaintiff's handcuffs); Palmer, 9 F.3d at 1436 (9th Cir. 1993) (affirming denial of summary judgment on qualified immunity where deputy allegedly employed excessive force by handcuffing plaintiff so tightly that he was in pain and

---

[6](...continued)
apparent that there was no law in this Circuit specifically relating to tight handcuffing, and more specifically, as it relates to the issue of the constitutional implication of loosening tight handcuffing." Brief of Appellee at 17.

8

was left bruised for several weeks).[7]

this opinion.

## IV. CONCLUSION

For the foregoing reasons, we will reverse the order of the district court entered on October 22, 2002, and remand the case for proceedings consistent with

---

[7]This case is distinguishable from Hannula v. City of Lakewood, 907 F.2d 129, 132 (10th Cir. 1990), in which the Court of Appeals for the Tenth Circuit analyzed an excessive handcuffing claim under a substantive due process standard, rather than the Fourth Amendment reasonableness standard, to conclude that the failure to loosen tight handcuffs did not rise to a clearly established constitutional violation. The court noted that the amount of force used was not substantial, the extent of the injury was minimal, and the evidence failed to establish malice. Likewise, Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001), is distinguishable in that the plaintiff there failed to show more than a de minimis injury resulting from her tight handcuffing. Where, as here, a plaintiff alleges actual injury inflicted by a police officer in the course of an arrest, and supports his allegation with specific facts so that it cannot be said as a matter of law that the use of force was objectively reasonable, the issue of whether excessive force was employed must be left to the trier of fact.

*Kopec v. Tate*, No. 02-4188.

SMITH, *Circuit Judge*, Dissenting:

I respectfully dissent from the majority opinion because I believe that the facts, even when viewed in the light most favorable to Kopec, fail to demonstrate that Officer Tate deprived Kopec of the protections of the Fourth Amendment right to be free from the use of excessive force during an arrest. Caselaw establishes that tight handcuffing alone is insufficient to state a claim of excessive force. *E.g. Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002). A plaintiff must demonstrate not only that the officer had notice that the force applied by the handcuffs was excessive under the circumstances, but also that the officer failed to respond to such notice in a reasonable manner. *Id.* Here, once Officer Tate had received notice that the force applied by the cuffs may have been excessive, he responded reasonably under the circumstances.

Yet even if the facts *were* sufficient to state a claim of excessive force, I would still be in dissent because I believe that Officer Tate should be entitled to qualified immunity. The Supreme Court has repeatedly instructed that the determination of qualified immunity requires particularizing the constitutional right "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This is where I believe the majority's analysis falls short, because it only relies on the broad proposition that the Fourth Amendment secures the right to be free from the use of excessive force during an arrest, and concludes that Officer Tate violated this clearly established right. This analysis is flawed, in my view, because it fails to determine what the contours of the right were, and neglects to recognize that the law did not provide Officer Tate with fair warning that he was required to respond more promptly than he did to Kopec's complaint that the handcuffs were too tight.

I would, therefore, affirm the District Court's grant of summary judgment in favor of Officer Tate.

I.

As the Supreme Court instructed in *Saucier*, 533 U.S. at 201, the first inquiry in deciding whether qualified immunity is available is whether there was a violation of a constitutional right. *See also Siegert v. Gilley,* 500 U.S. 226, 231-33 (1991). When an excessive force claim arises in the context of an arrest, it must be "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (applying Fourth Amendment's reasonableness standard to § 1983 excessive use of force claim and declaring that one of the factors to be considered is "how [a seizure] is carried out"). The Supreme Court has recognized that the right to make an arrest "carries with it the right to use some degree of

physical coercion or threat thereof to effect it," and that "'[n]ot every push or shove'" violates the Fourth Amendment. *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The *Graham* Court instructed that careful attention must be given to "the facts and circumstances of each particular case" and that the reasonableness of "a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S. at 396.

Similarly, not every instance of tight handcuffing offends the Fourth Amendment's right to be free from the use of excessive force during an arrest. Indeed, several of our sister circuits have recognized as much[8]

In some circumstances, however, tight handcuffing may give rise to a Fourth Amendment violation. *See Herzog v. Village of Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002) (concluding that summary judgment was improperly granted in favor of the officers where plaintiff was arrested without probable cause and handcuffed for an hour despite complaints that the cuffs were too tight). In determining whether Kopec was deprived of his Fourth Amendment right to be free from the use of excessive force, it is instructive to review the caselaw in which the facts have been sufficient to state a claim. These cases demonstrate that a viable excessive force claim requires that the officer or officers had either constructive or actual notice that the force applied by the

---

[8]*See also Braun v. Baldwin*, 346 F.3d 761, 763 (7th Cir. 2003) (affirming, *inter alia*, grant of summary judgment for defendants on excessive use of force claim based on tight handcuffing because there was no indication "arrest was effected in an unusual or improper manner"); *Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002) (summary judgment for officers on excessive force claim affirmed because officers removed the handcuffs once plaintiff complained they were too tight); *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) ("painful handcuffing, without more," is not excessive force); *Glenn v.*
(continued...)

[8](...continued)
*City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (declaring that "handcuffing too tightly, without more, does not amount to excessive force"); *Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999) (finding that plaintiff's allegation that she was handcuffed too tightly was "so insubstantial that it cannot as a matter of law support her claim" of excessive force); *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (court affirmed grant of summary judgment for officers based on tight handcuffing, explaining that plaintiff's allegations of pain alone were insufficient to support his claim of excessive force).

11

handcuffs was excessive under the circumstances, yet the officer or officers failed to respond to such notice in a reasonable manner.[9]

[9]*See Kukla v. Hulm*, 310 F.3d 1046 (8th Cir. 2002); *Bastien v. Goddard*, 279 F.3d 10, 12-13 (1st Cir. 2002) (reversing judgment for officer based on tight handcuffing for more than four hours despite plaintiff's repeated complaints); *Kostrzewa v. City of Troy*, 247 F.3d 633, 639-40 (6th Cir. 2001) (officer documented that he had been able to tighten the cuffs to only the first tooth because the plaintiff had large wrists, yet he ignored plaintiff's persistent complaints that the cuffs were too small and tight until after the plaintiff was booked); *Heitschmidt v. City of Houston*, 161 F.3d 834, 839-40 (5th Cir. 1998) (reversing summary judgment for officers who ignored repeated complaints over a four-hour period and pointing out that the officers had no justification for refusing to adjust the painful cuffs); *Martin v. Heideman*, 106 F.3d 1308, 1310, 1313 (6th Cir. 1997) (plaintiff's complaints that his hands were becoming numb and swollen and the officer's failure to adjust the handcuffs were sufficient to state a Fourth Amendment claim); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1323 (9th Cir. 1995) (officer failed to adjust handcuffs even though plaintiff complained of pain, alerted the officer that his medical

(continued...)

For example, in *Palmer v. Sanderson,* 9 F.3d 1433 (9th Cir. 1993), one of the earliest tight handcuffing cases, the plaintiff's complaints that the handcuffs were too tight and painful provided the officer with constructive notice that the force used might have been excessive under the circumstances. Despite this notice, the officer refused to loosen the handcuffs. *Id.* at 1436. The Court concluded that "[u]nder these circumstances no reasonable officer could believe that the abusive application of cuffs was constitutional." *Id.*

Although the Ninth Circuit's decision in *Palmer* did not actually use the term "notice" in determining that the facts were sufficient to state a Fourth Amendment violation, substantively its analysis focused on that very issue. Thereafter, a number of circuit courts employed this same analysis, again without discussing the principle of notice, and concluded that there were sufficient facts to state an excessive force claim where the plaintiff's complaints about painful and overly tight handcuffing were ignored by the arresting officers. *See Herzog*, 309 F.3d at 1043; *supra* n.2.

The importance of the notice effected by a plaintiff's complaints that

[9](...continued)
condition necessitated adjusting the handcuffs, and the officer noted that the plaintiff's wrists were "mushy" when he applied the cuffs).

handcuffs are too tight and painful was demonstrated in *Burchett*, 310 F.3d at 937. There, the plaintiff, who had been handcuffed for three hours in a police cruiser, showed his family that his hands were swollen and blue. *Id.* at 941. The family, in turn, pointed this out to the officers, who agreed to release the plaintiff if he promised to behave. After the plaintiff agreed, the cuffs were released. *Id.* Thereafter, plaintiff claimed that the officers had violated his civil rights by using excessive force. The Sixth Circuit disagreed.

The *Burchett* Court recognized that "applying handcuffs so tightly that the detainee's hands become numb and turn blue certainly raises concerns of excessive force." *Id.* at 944. Furthermore, the Court acknowledged that its own precedents allowed a plaintiff to get to a jury by showing that "officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight." *Id.* at 944-45 (citing *Kostrzewa*, 247 F.3d at 641, and *Heideman,* 106 F.3d at 1310, 1313). Unlike other cases presenting a constitutional violation, the Court explained, the record gave "no indication that [plaintiff] had previously complained or advised the officers that the handcuffs were too tight. . . . Until [the officers] had *notice* that the handcuffs were too tight, the officers were unaware of the problem." *Burchett*, 310 F.3d at 945 (emphasis added). Because the officers had responded to the plaintiff's lone complaint

by removing the cuffs, the Court concluded that there was no violation of the plaintiff's Fourth Amendment right.

II.

In determining whether the record in this case presents facts sufficient to demonstrate a claim of excessive force, I consider those facts, as the majority also has, in the light most favorable to Kopec. *See Saucier*, 533 U.S. at 201 (instructing courts to consider threshold question of whether there is a constitutional violation in the light most favorable to the injured party). Accordingly, I rely upon Kopec's account of events. I set forth the facts separately here so that, consistent with *Graham*, they may be analyzed from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396.

It is undisputed that Officer Tate apprehended Kopec and Smith while they were trespassing on private property around 11 p.m. on a cold, snowy night. Thus, he had probable cause to arrest them. Officer Tate advised Kopec and Smith, however, that "he was going to let [them] go and it was no big deal and that he needed [their] names and addresses" to fill out a report. Kopec inexplicably refused to cooperate with this simple request. Officer Tate then explained why he needed the information. Kopec still refused to provide any information to Officer Tate, prompting the officer to advise the pair that they were "not in trouble and that it was just procedure." Kopec was unmoved. Officer Tate then

13

arrested and handcuffed Kopec.

According to Kopec, the officer

placed the cuffs on me. We were about 30 feet from his cruiser. Put the cuffs on behind my back and we started to walk towards his cruiser.

And in a very short time, within about ten seconds, I began to lose feeling in my right hand. And I asked if he could loosen the handcuff, that it was too tight. And we continued walking towards the cruiser and I asked him if this is what he does when people don't give him information.

* * *

He ignored me. We got to the cruiser, to the back door, and he spun me, turned me around so that my back was facing the back door. And he proceeded to walk back to Pam the 30 feet.

And I asked him again. The pain became unbearable to me and I asked him if

could take the handcuff[s] off and again asked if this is what he did to get information out from people.

The officer proceeded to interview Smith. Kopec fell to his knees and groaned: "Get the cuffs off, I can't feel my hand." Kopec then stated that the pain was "unbearable." Officer Tate acknowledged the complaint and informed Kopec that he would "be there in a minute." Kopec groaned again: "Get these cuffs off, I can't feel anything right now." Officer Tate stopped interviewing Smith, returned to the cruiser, and assisted Kopec up off the ground. In order to assess the restrictiveness of the cuffs, Officer Tate escorted Kopec to the rear of the cruiser and laid him on the trunk to view the restraints. Officer Tate asked him if it was permissible to remove Kopec's gloves. After Kopec assented, Tate loosened the cuffs.

Kopec's initial statement to Officer Tate did not communicate anything more than a complaint about tightness. From the perspective of a reasonable officer, it would not have been unusual for an arrestee to initially request that the cuffs be adjusted or loosened. Handcuffs, by their very nature, are restrictive, uncomfortable, and unfamiliar to most individuals. Although Kopec affirmed during his deposition that he experienced a loss of feeling within about ten seconds of being cuffed, careful

14

reading of his testimony reveals that he did not express this to Officer Tate.

Kopec's second request to have the cuffs removed was also devoid of any suggestion that the cuffs were too restrictive or were causing him pain. Although Kopec testified to the effect that he experienced unbearable pain, he did not advise Officer Tate of that fact. Rather, Kopec testified that he "asked him if he could take the handcuff[s] off and again asked if this is what he did to get information out from people." From a reasonable officer's viewpoint, this second request to remove the cuffs, together with the repeated inquiry about Officer Tate's tactics for obtaining information, could reasonably be viewed as theatrics by Kopec protesting his arrest and the application of handcuffs.

When Kopec fell to the ground, groaned, and stated that he could not feel his hand, Officer Tate was, for the first time, put on notice that the force applied by the cuffs may have been excessive. In light of Kopec's earlier conduct, a reasonable officer would have had reason to question the genuineness of this complaint. Because this complaint may have been theatrics and because Officer Tate was legitimately engaged in interviewing Smith, it was not unreasonable for Officer Tate to proceed with the task in which he was already engaged. Indeed, interviewing Smith was necessary because of Kopec's refusal to provide any information whatsoever.

When Kopec groaned again and demanded that Officer Tate remove the cuffs because he was unable to feel his hand, Officer Tate interrupted his interview of Smith and returned to Kopec's side to evaluate the cuffs.

Viewed from the perspective of a reasonable officer, Tate's conduct was not, in my view, unreasonable. He was constitutionally permitted to apply some force in arresting Kopec. After receiving notice that the force applied by the cuffs may have been excessive, Officer Tate responded reasonably.

I acknowledge that there was a brief delay in responding to Kopec's complaints. That delay, however, was not unreasonable in the absence of any indication of pain or suffering in Kopec's initial statements that would have conveyed to Tate that the force was excessive under the circumstances. Once Kopec fell to the ground and demanded the removal of the cuffs claiming a lack of feeling in his hand, Officer Tate advised that he would "be there in a minute" and responded within a reasonable period of time.

In my view, the totality of the circumstances considered by the majority has not adequately taken into account the fact that there was only one officer at the scene, and that he was occupied with another task that was a legitimate police duty. In explaining its assessment of the attendant circumstances, the majority points out that Officer Tate "faced rather

benign circumstances that hardly justified his failure to respond more promptly to Kopec's entreaties . . . . Officer Tate was not, after all, in the midst of a dangerous situation involving a serious crime or armed criminals." Slip op. at 7. I agree that Officer Tate was not immediately confronted with a dangerous situation. Yet from the perspective of a reasonable officer, on the scene alone and dealing with two trespassers who were inexplicably unresponsive to his inquiries, there was justification for the officer's refusal to immediately indulge Kopec's initial requests so that the interview with Smith might continue.

In sum, I conclude that Kopec has failed to establish that there was a violation of his Fourth Amendment right to be free from the use of excessive force. Ordinarily, in the absence of a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. I address the issue of qualified immunity only because I believe that, even if there was sufficient evidence to demonstrate a constitutional violation, Officer Tate should be accorded qualified immunity.

## III.

The Supreme Court has repeatedly instructed that the determination of qualified immunity requires particularizing the constitutional right and determining the contours of that right. *See Saucier*, 533 U.S. at 201-02 (discussing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In *Saucier*, the Supreme Court held that a "ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest." 533 U.S. at 197. Thus, the determination of whether there is a constitutional violation is not co-extensive with the issue of whether a government official is entitled to qualified immunity. For that reason, the Supreme Court laid out the now familiar framework for analyzing qualified immunity claims, instructing that the first inquiry is whether there is a constitutional violation. *Id.* at 200. If such a violation is demonstrated, the next "step is to ask whether the right was clearly established." *Id.* at 201. The Supreme Court reiterated that this second "inquiry, it is vital to note, must be undertaken *in the light of the specific context of the case*, not as a broad general proposition." *Id.* (emphasis added).

Consistent with this iteration, the *Saucier* Court observed that *Graham*'s general proposition that the use of excessive force is contrary to the Fourth Amendment was not particularized enough for the purpose of determining whether the law was clearly established. 533 U.S. at 201-02. Quoting *Anderson v. Creighton*, the Court emphasized that the "'contours of the right must be sufficiently clear,'" and it instructed that

[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.

*Saucier*, 533 U.S. at 202 (quoting *Anderson*, 483 U.S. at 640).

In *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002), we observed that the two- part test enunciated in *Saucier* "clarif[ied] the analysis to be undertaken by district courts and courts of appeals considering claims of qualified immunity in cases alleging excessive use of force." Although my colleagues have employed the two-part test set forth in *Saucier*, I do not believe that their reliance on only the Fourth Amendment's broad, general proscription against the use of excessive force is sufficient because it fails to take into account the situation confronting Officer Tate.

Supreme Court qualified immunity jurisprudence has long required that courts undertake a particularized inquiry. In the seminal case of *Anderson*, the Supreme Court observed that the determination of whether there is qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." 483 U.S. at 639 (examining qualified immunity in the context of a warrantless search). The Court recognized that if the test were applied at a general level, as I believe the majority does here, then "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability. . . ." *Id.* Whether a legal rule is "clearly established," the Court instructed, must be considered in a

*more particularized*, and hence, more relevant sense: The *contours of the right* must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* (citations omitted) (emphasis added).

17

Subsequently, in *Wilson v. Layne*, 526 U.S. 603 (1999), the Supreme Court concluded that allowing the media to ride along during the execution of a search warrant violated the Fourth Amendment. In determining whether qualified immunity was available to the officers, the Supreme Court reviewed its decisions in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), and *Anderson, supra*, observing that

> [i]t could plausibly be asserted that any violation of the Fourth Amendment is "clearly established," since it is clearly established that the protections of the Fourth Amendment apply to the actions of police. . . . However, as we explained in *Anderson*, the right allegedly violated must be defined at the *appropriate level of specificity* before a court can determine if it was clearly established. In this case, the appropriate question is the objective inquiry whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly

> established law and the information the officers possessed.

526 U.S. at 615 (emphasis added) (citations omitted). The Court held that it was not unreasonable for the officers to believe their conduct was lawful. In explaining its holding, the Supreme Court pointed to the absence of caselaw regarding the constitutionality of allowing the media to accompany police, as well as the existence of a government policy by the United States Marshal Service regarding the practice, and declared that the "state of the law . . . was at best undeveloped." 536 U.S. at 618. The Court further noted that a circuit split had developed on the question and declared that "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Id.*

Most recently, in *Hope v. Pelzer*, 536 U.S. 730 (2002), the Supreme Court reversed the Eleventh Circuit's determination that qualified immunity precluded liability for a prisoner's claims that his Eighth Amendment rights had been violated when he was handcuffed to a hitching post for seven hours. Citing its earlier precedents, the Supreme Court declared that the "salient question . . . is whether the state of the law in 1995 gave respondents *fair warning* that their alleged treatment of [the inmate] was unconstitutional." *Id.* at 741 (emphasis

18

added). It concluded that the defendant officials had fair warning that the use of the hitching post under the circumstances alleged by Hope was unlawful, noting two Eleventh Circuit decisions and a report by the Department of Justice regarding the unconstitutionality of Alabama's practice of using the hitching post. *Id.* at 743-45. In addition, the Court observed that the "obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment." *Id.* at 745-46.

Accordingly, consistent with *Hope, Saucier*, *Wilson* and *Anderson*, I consider what the contours of the right were at the time of Kopec's arrest and whether they were sufficiently clear to put Officer Tate on notice that his conduct would violate the Fourth Amendment right to be free from the use of excessive force. *Saucier*, 533 U.S. at 202.

In February 2000, only a handful of cases of § 1983 claims involving tight handcuffing were extant. *See Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999); *Heitschmidt v. City of Houston*, 161 F.3d 834, 839-40 (5th Cir. 1998); *Martin v. Heideman*, 106 F.3d 1310, 1313 (6th Cir. 1997); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1323 (9th Cir. 1995); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993); *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990). Significantly, in *Carter* and *Foster*, tight handcuffing alone was insufficient to establish an excessive force claim. The remaining cases, however, concluded there were sufficient facts to demonstrate a Fourth Amendment violation. As I point out above, the common thread in these latter cases is that: (1) the arrestee complained that the cuffs were too tight and painful, thereby providing notice to the officer(s) that the force applied may have been excessive under the circumstances; and (2) the officer(s) failed to reasonably respond to the arrestee's complaints. Thus, the caselaw in February 2000 established that liability may attach if an officer unreasonably ignores or is indifferent to the complaints of an arrestee that the force applied by the handcuffs may be excessive under the circumstances.

Prior to the incident at issue in this case, the caselaw did not provide any guidance with respect to how quickly an officer must respond to a complaint that handcuffs have been applied too tightly. Nor was there any guidance in the cases as to how an officer should prioritize his response when there are other tasks in which he is legitimately engaged or may be required to undertake at the time.

In light of this caselaw, I conclude that Tate could have reasonably believed that his response to Kopec's complaints was lawful. To put it another way, I believe the law did not put Officer Tate on notice that he had to respond immediately to Kopec's complaint that the handcuffs

19

were too tight. Nor was there any caselaw providing Officer Tate with fair notice that he must stop engaging in the legitimate police task at hand, *i.e.*, interviewing Smith, in order to assess whether the handcuffs were too tight. Because the caselaw did not provide Tate with notice that his response was unlawful, he should be entitled to qualified immunity. *See Hope*, 536 U.S. at 741; *Saucier*, 533 U.S. at 202.

In summary, I conclude that the facts fail to demonstrate a violation of the Fourth Amendment right to be free from the use of excessive force. Even if the facts did state a claim of excessive force, Officer Tate should be entitled to qualified immunity. Accordingly, I would affirm the District Court's order granting summary judgment for Officer Tate.