NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2126
_____

JEAN LAWNICZAK, as Personal Representative
of the Estate of John Orlando, Deceased,

Appellant

v.

COUNTY OF ALLEGHENY; ORLANDO HARPER; SIMOIN WAINWRIGHT;
MARGUERITE BONENBERGER; ANDREW HABURJAK; JOHN PIENDEL;
JASON BEASOM; JOHN WILLIAMS; THOMAS FLAHERTY; ROMAN CAITO;
CASEY MULLEN; DAVID C. DABROWSKI; TRICIA CORRADO;
TERESA LATHAM; MICHAEL CERDA
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-17-cv-00185)
Honorable Lisa P. Lenihan, United States Magistrate Judge
_____

Submitted under Third Circuit L.A.R. 34.1(a)
February 7, 2020

BEFORE:  SHWARTZ, SCIRICA, and COWEN, Circuit Judges

(Filed: May 1, 2020)

_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

COWEN, Circuit Judge.

Plaintiff Jean Lawniczak appeals from the order and judgment of the United States District Court for the Western District of Pennsylvania granting Defendants' motion for summary judgment. We will affirm.

I.

John Orlando committed suicide while in detention at the Allegheny County Jail ("ACJ"). Lawniczak, Orlando's mother, filed this 42 U.S.C. § 1983 action,[1] naming as Defendants Allegheny County, ACJ Warden Orlando Harper ("Warden Harper"); ACJ Deputy Warden Simon Wainwright ("Deputy Warden Wainwright"), ACJ Corrections Officer Marguerite Bonenberger ("Corrections Officer Bonenberger"), ACJ Sergeant Andrew Haburjak ("Sergeant Haburjak"), and Tricia Corrado, R.N. ("Nurse Corrado").[2] Lawniczak brought her claims under the Eighth Amendment, but she acknowledges that, because Orlando was a pre-trial detainee, they "must be analyzed under the Fourteenth Amendment, pursuant to Third Circuit jurisprudence." (Appellant's Brief at 12 n.3 (citing Colburn v. Upper Darby Twp., 838 F.2d 663, 668 (3d Cir. 1988); Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003)).) Specifically, Count I of her amended complaint alleged a municipal liability claim against Allegheny County premised on its failure to prevent suicide or self-harm amongst at-risk inmates due to inadequate staffing as well as the failure to train employees in the proper procedures to protect at-risk inmates. Count II alleged that the individual Defendants acted with

_____

[1] The parties consented to a United States Magistrate Judge conducting any or all proceedings in this matter. See 28 U.S.C. § 636(c)(1).

[2] The other defendants named in this action were dismissed pursuant to stipulation.

2

reckless indifference by failing to take reasonable steps to ensure Orlando's safety (and, specifically with respect to Warden Harper and Deputy Warden Wainwright, by allegedly failing employ an adequate level of staffing). Finally, Count III set forth a wrongful death claim under state law.

Defendants moved for summary judgment. The District Court granted their motion and entered judgment in their favor and against Lawniczak. The District Court explained that "[i]n this Circuit, 'the vulnerability to suicide framework applies when a plaintiff seeks to hold prison officials accountable for failing to prevent a prison suicide.'" Lawniczak v. Allegheny Cty., Civil Action No. 17-00185, 2019 WL 1923379, at *5 (W.D. Pa. Apr. 30, 2019) (quoting Palakovic v. Wetzel, 854 F.3d 209, 224 (3d Cir. 2017)). According to the District Court, "there is no evidence from which a reasonable jury could conclude that CO Bonenberger, Sgt. Haburjak, and Nurse Corrado were deliberately indifferent to suicide throughout their interactions with him." Id. at *6. Viewing the evidence in the light most favorable to Lawniczak, the District Court determined that "the record reflects that all three Defendants 'were sensitive to a potential that [Orlando] was suicidal and took more than necessary precautions based on the available information and circumstances as they appeared.'" Id. (quoting Baez v. Lancaster Cty., 487 F. App'x 30, 32 (3d Cir. 2012)). With respect to the claims against Allegheny County, Warden Harper, and Deputy Warden Wainwright, the District Court concluded that these secondary theories of liability necessarily failed given its determination that Orlando's constitutional rights were not violated. It also declined to exercise supplemental jurisdiction over the remaining state law count. See 28 U.S.C. §

3

1367(c)(3).

## II.

"The Due Process Clause of the Fourteenth Amendment provides pre-trial detainees at least as much protection for personal security as the level guaranteed to prisoners by the Eighth Amendment."[3] Palakovic, 854 F.3d at 222 (citing Colburn, 838 F.2d at 668). Under "the vulnerability to suicide" framework, a plaintiff must show:

> (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

Id. at 223-24 (footnote omitted). We agree with the District Court that no reasonable juror could find that Corrections Officer Bonenberger, Sergeant Haburjak and Nurse Corrado acted with reckless or deliberate indifference.

Upon Orlando's arrival at the ACJ following his arrest for simple assault, harassment, and public drunkenness, the arresting police officers told Corrections Officer Bonenberger that Orlando had said that he wanted to hang himself. Corrections Officer Bonenberger conveyed this information to Sergeant Haburjak. Experiencing the effects

---

[3] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's order granting a motion for summary judgment. See, e.g., Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 265 (3d Cir. 2014). Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." Natale, 318 F.3d at 580 (citing Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002)).

of withdrawal, Orlando was extremely agitated and distraught. During the intake process (which was videotaped), Orlando said: "I'm sick. I'm dying of liver disease. I'm on high doses of Fentanyl and Xanax. I'm going to die in here. I'm going to fucking die in here. I am going to die in here." (RR267.) Immediately following those statements, he said "I hope I die. Caus' you're going to be in trouble" and "I hope I fucking die in here." (Id.) Lawniczak emphasizes the fact that "Sergeant Haburjak expressly acknowledged Mr. Orlando's need for a suicide gown" but "failed to provide him one." (Appellant's Brief at 16 (emphasis omitted) (citing RR259-RR260).) However, Orlando was "confined . . . to a chair with wrist, waist, and ankle restraints for approximately eight (8) hours." (Id. (citing RR259-RR260).) While restrained, he was placed in a cell used for inmates on suicide precautions, which is located directly in front of the corrections officer's desk and which permitted the officers to observe Orlando. The two corrections officers did not relay to Nurse Corrado what the arresting officers said to Corrections Officer Bonenberger before she interviewed Orlando, but Orlando's statements about killing himself were included in their subsequent written reports. "The record also reflects that Nurse Corrado examined Orlando moments after he was placed in the restraint chair" and that he continued to threaten "to harm everyone present, including himself." (RR47.) Given the volatile natu're of the whole episode (as well as the fact that Nurse Corrado concluded that Orlando was suicidal based on her own observations and Orlando's responses to her questions), we agree with the District Court that "no reasonable jury could find that CO Bonenberger and Sgt. Haburjak's failure to inform Nurse Corrado of [Orlando's statements to the arresting officers] constituted deliberate

5

indifference to Orlando's particular vulnerability to suicide." Lawniczak, 2019 WL 1923379, at *6.

Lawniczak takes Nurse Corrado to task because she "failed to refer Mr. Orlando to an outside facility for mental health treatment even though she had the authority to do so or to place Mr. Orlando on suicide precautions when she cleared him for admittance to ACJ, even though she had the authority to do so." (Appellant's Brief at 16-17 (emphasis omitted) (citing RR260) (further noting that Nurse Corrado allegedly failed to include vital information regarding Orlando's mental state in shift-to-shift report).) Admittedly, Orlando did disclose to Nurse Corrado his current drug usage as well as his history of mental health problems. Nurse Corrado concluded he was a harm to himself and suicidal. Furthermore, she testified at her deposition that she received no formal training at the ACJ exclusively devoted to suicide prevention practices and could not recall that the ACJ had a written suicide prevention policy at the time of her interactions with Orlando.[4] We reiterate, however, that, at the time Nurse Corrado interviewed and medically cleared Orlando for ACJ admission, Orlando was still restrained in a cell that could be directly monitored by the corrections officers. Nurse Corrado also knew that after his arraignment, Orlando would be seen not only by another nurse—for a comprehensive assessment of his medical needs—but, if necessary, also by a mental health specialist.

---

[4] It appears that Orlando was not examined by a mental health specialist until after he was removed from the restraint chair. "Pursuant to ACJ policies and procedures, Mr. Orlando should not have been released from the restraint chair without the approval of a mental health specialist" and "should have been placed in a suicide gown as a preventative measure." (Appellant's Brief at 5-6 (citing RR124, RR134, RR160-RR178).)

In fact, Orlando was subsequently seen by another nurse as well as a mental health specialist. The interactions between Orlando, Corrections Officer Bonenberger, Sergeant Haburjak, and Nurse Corrado occurred on March 24-25, 2016, and Orlando hanged himself on March 29, 2016. In the interim, Orlando was seen by, among others: (1) Charlotte Wright (who was employed by an external agency providing various services to individuals suffering from mental health issues); (2) Nurse Theresa Latham (who conducted a comprehensive medical assessment of Orlando and actually referred him to a mental health specialist); (4) Mental Health Specialist Ruth Harrison (e.g., "Mr. Orlando was 'cleared to population' by a mental health specialist" (Appellant's Brief at 8 (quoting RR102, RR179-RR180)), resulting in his assignment to a mental health unit (Pod 5-F) where inmates are "double celled" with a cellmate); and (5) D.W. Stechschulte, M.D. (who saw Orlando on March 28 and March 29 and cleared him to be transferred to the general population approximately two and a half hours before the hanging occurred).

Because Orlando's constitutional rights were not violated, Lawniczak's claims against Allegheny County, Warden Harper, and Deputy Warden Wainwright necessarily fail.[5] See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

---

[5] According to Lawniczak, Deputy Warden Wainwright admitted that the ACJ did not have enough manpower to monitor Pod 5-F, that the ACJ may need to reevaluate how they handle people with mental health issues, and that the treatment of inmates with mental health issues could be classified as inadequate. She also contends that Warden Harper received complaints from a couple of corrections officers regarding inadequate staffing levels (which he found to be invalid) and that he did not know if ACJ intake staff were properly trained in suicide prevention practices. However, there were three corrections officers working on the pod at the time of the hanging. Regarding Deputy Warden Wainwright's alleged "inadequate" treatment statement, we agree with the District Court that he "was specifically testifying about the 'use of force' with respect to

7

III.

For the foregoing reasons, we will affirm the order and judgment of the District Court.

---

the ACJ's treatment of mental health inmates." Lawniczak, 2019 WL 1923379, at *2 n.8. Warden Harper likewise testified at his deposition that suicide prevention training was provided to the staff (even though he could not say at that time that all of the intake personnel were trained).